Good morning. May it please the Court, my name is David Sussiner and I represent the petitioner Zhih-Kwang Wu. On June 30, 1999, Assistant United States Attorney John Gomez of the United States Attorney's Office for the Southern District of California sent a letter to Doris Meissner, who is then the Commissioner of what used to be the Immigration and Nationalization Service. In his letter to Ms. Meissner, Mr. Gomez... This is a letter that appears in AR-266, 267, mentioning, among other things, that because of Mr. Wu's cooperation with the United States Government as a material witness in a federal criminal case against a snakehead Chinese smuggling operation, that Mr. Wu would be subject to retaliation and reprisal in the People's Republic of China. Let me ask you a couple of questions about that. Absolutely. Of course, someone who testifies for the government, whether it's a domestic or foreign criminal organization, faces some risk from the criminal organization. However, it's not one of the five categories. I cannot find any case where a social group is defined broadly enough to fit that category of people. I don't think you have one, do you? Is there a precedent? Well, if I may start, Your Honor, with the, on account of imputed political opinion, which I think, frankly, is a stronger argument on our behalf. As we mentioned in our Rule 28J letter, our first one, there have been two recent decisions from this Court that deal with whistleblower context. And our position is that Mr. Wu's cooperation with the United States Government as a material witness could subject him to reprisal, to persecution. What's the politics? I mean, the snakeheads just want to make money. He was working for the snakeheads in the engine room, and then he was getting himself a break from the government. I don't understand what the politics is. Well, Your Honor, the administrative record is replete with country-conditioned evidence. I'd be glad to point you to specific articles illustrating that the snakehead operations in the People's Republic of China are permeated, or I would guess you could say commingled, with governmental officials who have been corrupted by the snakeheads. So in that regard, Mr. Wu's participation as a material witness in this case would subject him to at least imputed, at least there would be an imputed view by those local government officials that he was whistleblowing. Now, whether he actually whistleblew on those officials or not is immaterial for purposes of the imputed political opinion calculation. Well, it's really a stretch. I mean, it's a good argument that lawyers make, but it's just a stretch, isn't it? I mean, what politics? This doesn't have anything to do with imputed political opinion. We're way outside any case that I could find in this area that would indicate that this qualifies. What's your best asylum case in terms of the categories, imputed political opinion? What's your best case that you say necessarily leads us to the conclusion that your client qualifies? What I would like to point you to, Your Honor, is a passage in the Zhu opinion, which I cite in my 28-G letter, and that discusses the 2003 State Department country condition report from the People's Republic of China and noted that individuals who whistleblow in the People's Republic of China are subject to severe reprisal. Whistleblow against the government? Those people who would be whistleblowers in the People's Republic of China. Against the government? Against the government, Your Honor. And so then we have to say, we have to, in order to follow that, say, well, here you have some government officials who are tangled up with the snakeheads, therefore, therefore, therefore. That's how you get to the government part of the whistleblowers. Our view is not only that you have a governmental component, as you say, Your Honor, but also that if the snakeheads were to retaliate against him because of their view that Mr. Wu was trying to somehow clean up the smuggling situation in China, and our country condition articles mention that the People's Republic of China views the corruption of local government officials by the snakeheads as a serious political problem. That gives rise, we believe, to an imputed political opinion. Counsel, he wasn't trying to clean up corruption in China. He wasn't doing anything in China. I can understand where somebody who snitches the local cadre out because he's stealing government money that goes to the village and he's demanding kickbacks from the villagers. That kind of whistleblower may be imputed. That may be an imputed political opinion case, and I think those are the cases you're talking about. But this guy didn't even do anything in China. He was working in the engine room of a smuggling vessel, and when they all got caught, he rolled over on the bosses. Again, it's all just a matter of how the Chinese government would perceive him. We're not arguing that he actually did participate in whistleblowing through the information he gave to Mr. Wu. Why would they perceive him as having snitched out a village cadre in China, like the whistleblower cases? Well, I do know, Your Honor, that in an article published by a newspaper called The World Daily, and that appears in the administrative record, the Chinese government had stated, after receiving word of the various individuals, including Mr. Wu, who was named particularly in that article, they mentioned that if any of those individuals were to seek asylum in the United States, that none of them, not a single one, would be allowed to return. So it shows that there's some particular sensitivity by the People's Republic of China in terms of these individuals participating in this criminal investigation. What about your cat claim? You don't have to get to a political... Absolutely, Your Honor. Of course, to establish a cat claim, you don't have to demonstrate that you would be persecuted. So what's the evidence that he's likely to be persecuted? Hasn't he been living in the United States? He's been in the United States, out of custody, is that right? That's correct. He has been out of custody. And he has family in China? He does. He has a wife and a daughter. So what do you make of the argument that his having been at large all this time, there's been no reprisal against him in the United States where the snakeheads are reputed to have ability to go after him if they wanted to? What weight does that carry here? And that his family in China hasn't been approached? I think this Court has long established in the asylum context, Your Honor, that individuals who are not similarly situated, such as his family members who are not then subjected to reprisal, that fact does not have any materiality. But you're operating by negative implication. I mean, what's the affirmative evidence that he's likely to be tortured? There are several points, Your Honor. The first is the representation by Mr. Gomez himself in his letter to Ms. Meissner that Mr. Gomez is likely to be subject to torture. Yeah, but with all due respect to Mr. Gomez, and I can understand why he did what he did, and I might have done it too, but what does he know about this? Well, he was presumably in charge of the investigation. Yeah, one investigation, but you're talking about a completely different subject now. It seems that he's simply trying to help this guy out without knowing a lot about what he might be facing. I mean, is he a State Department official? I mean, does he have any background in the field that he's now talking about? I don't know whether the record establishes that, Your Honor. It doesn't. I inferred it was just if you testify for us, we'll do various things for you, and among them is we'll write you a letter. Is there any more than that? Well, there's additional evidence in the record, Your Honor. Mr. Wu did testify that he is fearful that he would be subjected to torture if the Chinese government were to apprehend him. What evidence is there that he'd be tortured? Yeah, what's the affirmative evidence? The affirmative evidence is Mr. Wu's testimony and the country condition evidence illustrating that the People's Republic of China is replete with torture in terms of its custodial conditions. Well, that's if the government busts him, if you get arrested there and put in jail. I think that's what they were talking about, isn't it? That is what we're talking about, Your Honor. And I think it is more likely than not, given the way the Chinese government has perceived this case, particularly in its warnings to these people not to apply for political asylum and don't expect to come back. You have a procedural issue on the Catt claim, and you brought to our attention the case of Ornelas Chavez v. Gonzalez. That's right, Your Honor. It requires more than we appear to have in this case. Here the BIA seems to have just said, well, the IJ, we agree with the reasons of the IJ. Do you think that Ornelas Chavez requires us to remand this case for the kind of determination that it talked about? Well, first, given that I'd like to reserve a little bit of rebuttal. Yeah, I'm asking. Go ahead. Sure, certainly, Your Honor. I do believe that in this case, because the BIA did not specify that it had made a de novo review, conducted a de novo review of the IJ's findings, that this Court is then required to look to the IJ's decision for determination as to what influenced the BIA decision. Here, the oral decision of the IJ is completely devoid of any findings regarding the torture convention. Ornelas says we've got to review the IJ's decision as a guide to what lay behind the BIA's conclusion. And you're saying if we look there, we don't find very much. That's absolutely correct, Your Honor. I'm kind of telegraphing to the other side. I hope they've had a chance to see this 28-J letter and read Ornelas Chavez. I know that she has, Your Honor, because I pointed out to her today. Good. Thank you, counsel. So I'd like to reserve the remainder of time. There isn't any remainder. You're a half minute over. We'll give you one minute. Okay, thank you very much. Good morning. May it please the Court, my name is Antoinette Barksdale, and I represent the Attorney General in this proceeding. As we explained in our brief, the IJ's decision denying eligibility. You know, we know what the IJ in your brief said. I'm really curious here. You say you represent the Attorney General. So did Gregory Vega, who wrote this, or Mr. Gomez, represented the government. We had another case, a related case, which is off calendar, but he wrote a letter in that case as well. Same proceeding. The government was seeking, through the Justice Department, to prosecute smugglers. They needed witnesses. They got witnesses off the boat who they said, and if you cooperate and put yourself at risk, we will appeal on your behalf, make an appeal on your behalf to the immigration authorities, who at that time all reported to the Department of Justice, were all part of the Department of Justice. INS was then part of it. And I found it exceptionally curious that the government, having gotten the testimony, now is saying the other part of the government, all within the Department of Justice framework, is saying, well, you know, that doesn't cut much ice with us, no pun intended. And I'm just wondering, aren't you shooting yourselves in the foot of getting cooperating witnesses if it turns out that the AUSAs who go to prosecute these cases can't deliver on protection for their witnesses? Your Honor, it's our position that the AUSA did what he could do. He wrote a letter. I know what he did. He did what he did. But the institution isn't backing him up. Right. Well, we considered it, and the IJ considered it on the record. He considered that letter. And the letter said that he would probably suffer revenge, reprisal. And it's our position that even what he said in the letter does not fall within one of the protected grounds. No, but let's talk about torture under the CAT claim. It doesn't have to fall within a category. If he's going to go back and, you know, they chop his fingers off for being a cooperating witness, that's torture. Well, we didn't see any evidence that it was more likely than not that he would be tortured. How about the letter of the AUSA? I mean, that's what he told these people. You know, we know you guys. That's his state of mind per his letter. I just find it, you know, Judge Trott has more experience on the criminal side than I do, but I have to address this, but I have to say I was startled to see how little weight was given to the AUSA's letter and how you're vigorously saying, well, you know, that's too bad. Because, again, if I'm assuming that the potential cooperating witnesses know anything about this, but it seems hardly the way to get cooperating witnesses. If you get them to testify and then they don't, the government says, well, that's the right hand. The left hand has a different idea. Right. And basically I think the AUSA in his letter, if you see, he did not promise him that he could keep him here. He did not promise him anything. He just said I would write a recommendation on your behalf. You're begging my question. My question was I know. He didn't. He couldn't. Okay. The question is about the people who could, don't seem to want to back up their person who's on the prosecutorial side. That I'm still having trouble understanding. Right. And they considered it, but I guess they didn't. The court should deny the petition because the evidence in the record does not compel reversal of the board and IJ's decision that the petitioner has failed to establish that he suffered past persecution in his native country, or that he has a well-founded fear of persecution. This may be true if I can interrupt you for a second. Sure. I'd like to go to the Ornelas-Chavez issue. We've gotten a 28-J letter and it says procedurally there's a problem in this case because we have to go back to the IJ and it's not clear that the IJ explained the reasons for what the IJ did. What's your answer to the, when did you get the Ornelas-Chavez case? He just handed it to me this morning and I looked in it. Although he filed it, it must was a glitch on the ECM because he just handed me a copy of his letter. Do you have any, have you had an opportunity to tell us why, what you think about Ornelas-Chavez? No, we haven't had an opportunity, but we would, you know, we would like the opportunity if we need to get there. It's our position that we don't even need to get there, but if we need to get there, Your Honor, we would like the opportunity to write a response if you have some concern about that. But it's our position that basically once the IJ and the BIA ruled on the asylum that it was, it did not fall within the protected, one of the protected grounds that the heightened standard in CAT and the heightened standard of withholding and the fact that he didn't present any additional evidence fails. Yeah, but you understand, as Judge Fischer said, that a protected ground falls away when you get into CAT. Right, exactly. But it's still, our position is it's not more likely than not that he would be tortured if there's no evidence of harassment. That's why I call this procedural because Ornelas-Chavez says the court has required the board to state its reasons, whereas here the BIA does not expressly state whether it conducted de novo review or the lack of analysis in its order suggests it gave significant weight to the IJ's decision. So we go back and we look at the IJ's decision, we look for reasons, and we don't find them in this case very much. So that's the Ornelas-Chavez problem. Well, Your Honor, we would offer the opportunity to submit a supplemental on that issue if that's a concern that you have. One of the things I did want to raise as well is that he also submitted a supplemental with some additional evidence. Can you express whatever evidence there is in the record regarding, or the absence of it regarding whether Wu is more likely than not to be tortured if he goes back to China? Well, the evidence that's on the record is that he's not more likely. I mean, what we've got here. We have is that. Let me explain why I'm asking. What we've got here is the BIA says the applicant has not established that it is more likely than not that he would be persecuted or tortured upon return to China. The IJ said in his decision that he recognized that the Convention Against Torture does not need to establish that the fear of harm would be on account of a protected ground. However, he does need to establish certain other requirements. So they both addressed the Convention Against Torture. Neither of them discussed whatever evidence there was regarding whether it was more likely than not that Wu would be tortured. So what I'm asking you is, was there any such evidence, and what was it, and what do you have to say about it? Well, I think the IJ's evidence that he looked at was the fact that he's been working here for almost five years. He's been making money. No one has, you know, he's been sending money back to his family. No one has attempted to harm his family back in China. No one has attempted to harm here. The Snakeheads are an international organization all over the place. And he works at a restaurant cooking, and there has been opportunities if someone wanted to harm him, and that hasn't happened either to the petitioner or to his family that's back in China. So now the government, who touts its ability to keep the homeland safe, is saying that because the Snakeheads haven't come over from China to nail him over here, that we should make that conclusive on the conditions or persuasive on the ability of the Snakeheads operating on their own home turf? You think that? Our case law doesn't support that kind of argument. Well, we're saying that. I don't understand the argument. You're saying he got a material witness who was given assurances that he would have a fair shot at getting asylum or protection over here because if he goes back to China, having cooperated, he's going to, in the opinion of the AUSA, that this was going to subject him to the prospects of torture. We say, well, because the gangsters didn't come over here and get him, that proves that he's safe if he goes back to China. That's a heck of an argument. No, we're saying that even if he goes back and they do some harm, it's based on revenge or acquiescent retaliation. That's all it takes. And greed. It doesn't have to be a protected ground. Right, exactly. You don't seem to be grappling with that. It's a question that was posed precisely by the U.S. Attorney's letter. If he goes back, people who cooperate with us are at risk if they go back to China. That's why we are telling him that we will go to the immigration authorities and seek to get him the ability to stay in the United States. Okay? Thank you. Thank you. Counsel, you would use up your time, but my colleague suggested we ought to give you some time for rebuttal. One minute. Thank you, Your Honor. I just want to point out in addressing Judge Fischer's concerns about Mr. Wu's having worked as a cooperating witness and not getting any benefit from it, that we have long argued in this case that even though we would like for Mr. Wu to go to asylum or withholding under the torture convention, we would be willing to entertain alternative measures if the government would make them available. Unfortunately, throughout these proceedings, the government hasn't done so. We note that there will be new leadership in the Department of Justice in a matter of days, and perhaps the court, if it deems desirable, might consider deferring submission of this case until new leadership at the Department of Justice has had a chance to opine about this case. Otherwise, our position, we've stated our position in the briefs and argument, and as Judge Trott has noted, based on our Rule 28J letter, this case at the very least merits a remand to the board for purposes of actual CAT findings, which were not made by the IJ. Thank you very much. I don't know what to do about it. I would, and I understand what happens in these cases, but I would sure hope that people would be able to fax or somehow bring these 28J letters to the attention of counsel before, you know, oral argument. There's not enough time to respond. It's not a criticism. Just in the future, if you've got a 28J, call up the other lawyer and say, hey, can I fax this to you? Yeah, I will certainly know to do that with the electronic filing system in the future, Your Honor. I do know that the case was docketed on PACER, and notation was made to me that the other individuals, such as Ms. Barksdale, who are signed up for ECF, had received it, so I think it might have just been a glitch. Wait a minute. You were counting on the court to send it to her? No, no. She gets served electronically. You have email in your law office, I suppose. That's correct. You probably have her name in your directory. No, my understanding as to how the electronic filing system works is that she then receives a link via email to the 28J letter. All 28J lawyers ought to think, how can I immediately get this to the opponent, rather than rely on PACER and systems. Okay. I understand, Your Honor, and I apologize for any inconvenience. You don't have to apologize. I know how these things happen. Okay. Thank you very much. Thank you, counsel. Wu v. Mukasey is submitted.
judges: Trott, Kleinfeld, Fisher